**AMERICAN AIRLINES, INC., et al.**

v.

**CITY OF PHILADELPHIA.**

**Civ. A. No. 74–1571.**

United States District Court,
E. D. Pennsylvania.

March 8, 1977.

Bernard J. Smolens, Peter Hearn, Philadelphia, Pa., for plaintiffs.

Pace Reich, Deputy City Sol., Philadelphia, Pa., for defendant.

## OPINION

LUONGO, District Judge.

There is before me plaintiffs' Motion to Exclude Interim Interest and other charges.[1] A tracing of the tortured course of this litigation is necessary for an understanding of the motion.

Plaintiffs are nine commercial airlines which have, for a number of years, leased space in the City of Philadelphia's Airports.[2] Long term leases which expired on August 31, 1973 were extended to May 31, 1974 to enable the parties to continue negotiations for new leases for the expanded and improved facilities which the City was constructing at International Airport. The negotiations were not successful and the City threatened to impose a unilateral schedule of rentals, fees and charges in the place of negotiated ones. On May 31, 1974 the City's Department of Commerce did file a Regulation, effective Fiscal Year 1975 (commencing July 1, 1974) establishing rates and charges which were approximately three times as much as those called for under the expired leases.

The Airlines filed this suit on June 20, 1974, charging that the Regulation was unreasonable and discriminatory in violation of the Fourteenth Amendment, the Federal Aviation Act (49 U.S.C. § 1513), and the Airport and Airway Development Act of 1970 (49 U.S.C. §§ 1701, 1718), and that it imposed an impermissible burden on commerce because the rates, charges and fees thereby established were in excess of the charges required to maintain the facility. The relief sought was an injunction[3] against charges in excess of those required for operation and maintenance of the Airports. Alternatively, in a second count, the Airlines alleged that on June 18, 1974 they had filed a complaint with the Federal Aviation Administration seeking to rescind the City's schedule of rates, charges and fees. Pointing out that the FAA lacked power to issue a stay, plaintiffs sought from this court a stay of the new rates and charges pending final decision by the FAA or an appellate court.

---

1. By agreement the motion will be limited to Interim Interest without prejudice to plaintiffs' right to press for exclusion of other charges after such other objected to charges have been further identified and defined.

2. International Airport and North Philadelphia Airport.

3. The Complaint was later amended to seek a Declaratory Judgment.

The case was assigned to the calendar of my colleague, Judge Herbert A. Fogel. On July 17, 1974 the parties advised Judge Fogel that they had entered into a temporary "settlement" regarding rates and charges to be paid pending hearing on plaintiffs' request for a permanent injunction. Hearing on the permanent injunction was scheduled for October 15, 1974, but was postponed to November 25, 1974 upon representations to the court that the parties were engaged in discussions with the view to final settlement of the entire controversy. The November 25, 1974 hearing was cancelled when it was reported to the court that the parties had reached agreement, but that the agreement required memorialization by a written document, preparation of which would require substantial time, effort and negotiations. What happened thereafter is the subject of substantial dispute between the parties and has led to the filing of a series of motions.

Plaintiffs allege that after some sixteen months of extended negotiation, the parties finally ironed out all proposed changes and amendments which were incorporated into a document (hereinafter referred to as the Agreement). According to plaintiffs, on March 10, 1976, the parties met for the sole purpose of making final mechanical and proofreading refinements of the Agreement, but instead the City insisted on changes of substance imposing charges totalling approximately $2,500,000 per year more than those provided in the Agreement. The Agreement was not signed.

Contending that the parties had in fact entered into a binding settlement agreement notwithstanding their failure to sign the Agreement, plaintiffs, on April 20, 1976, filed a "Motion to Enforce Settlement Agreement." The City opposed that motion, denying that a settlement had in fact been agreed to, and contending further, as a matter of law, that the City's representatives did not have the power to enter into the alleged settlement. In due course, the City filed a "Motion for Summary Judgment" in its favor on plaintiffs' "Motion to Enforce Settlement Agreement." On September 8, 1976 I denied the City's motion for Summary Judgment, ruling that there were material issues of fact for trial.

While these matters were pending, on May 4, 1976, the City's Department of Commerce promulgated Regulation 2 fixing rentals, charges and fees for Fiscal Year 1977 (commencing July 1, 1976) at an annual rate of approximately $22 million as compared to the approximately $14 million provided under the Agreement. On June 17, 1976, plaintiffs filed a "Motion to Suspend Regulation 2."[4] The Motion to Suspend charged that counsel for the parties had stipulated and agreed that, pending decision on the Motion to Enforce Settlement Agreement, the Airlines would move into the new space and make payments in accordance with the terms of the Agreement; that the Airlines had, pursuant to that understanding, moved into the new space, but notwithstanding that stipulation and agreement, the City had promulgated Regulation 2. The City denied that there had been such a stipulation and agreement.

On June 29, 1976, Judge Fogel ruled that the parties had indeed so stipulated and entered an Order granting plaintiffs' Motion to Suspend Regulation 2 upon certain conditions including, inter alia, that (a) pending final determination of plaintiffs' Motion to Enforce Settlement Agreement, the parties were to be bound by the Agreement and the City was to charge "in accordance with rates calculated pursuant" thereto; (b) disputes concerning interpretation of the Agreement were to be presented to the court for resolution; and (c) plaintiffs were not to delay or withhold payment of billings made by the City on the basis of alleged incorrectness or invalidity of the billings, except upon specific authorization of the court.

Following entry of the June 29 Order, the City submitted to the Airlines invoices for

---

**4.** This Motion appears to be more in the nature of an Amended Complaint, updating the Complaint against the City to include allegations relating to Regulation 2, and seeking the return of certain amounts allegedly overpaid during Fiscal Year 1975.

amounts to be charged monthly during Fiscal Year 1977 which, on an annualized basis, totalled:

| | |
|---|---|
| Domestic Terminal Building | $14,482,328 |
| Landing Fees | 8,640,591 |
| Ramp Area | 284,000 |
| | $23,406,919 |

The Airlines objected to the invoices, contending that under the Agreement the charges for Fiscal Year 1977 should have been:

| | |
|---|---|
| Domestic Terminal Building | $ 8,230,000 |
| Landing Fees | 4,942,000 |
| Ramp Area | 284,000 |
| | $13,456,000 |

The difference between the City's and the Airlines' figures is $9,950,919. Of that amount, $7,660,175 is attributable to a charge denominated "interim interest." The City takes the position that interim interest for Fiscal Year 1977 is a proper item of expense to be charged to the Airlines. The Airlines contend that the Agreement does not contemplate interim interest as an item of expense, but rather is to be included in the total cost of the improvements as a capital item to be amortized over the life of the revenue bonds which the parties contemplated would be issued to pay for the improvements.

On July 21, 1976 the case was reassigned from Judge Fogel's calendar to mine. In an effort to avoid delay in payment of the invoices the City and the Airlines stipulated on August 10, 1976 that, until the court could rule on the propriety of the interim interest charge (which the Airlines intended to raise by filing an appropriate motion), the Airlines would pay all amounts invoiced except interim interest.[5] Following several delays, some of which were due to unavailability of counsel for the City, the Airlines filed the instant Motion to Exclude Interim Interest and Other Charges on November 15, 1976, seeking a determination that un-

der the Agreement, to the extent that it had been incorporated in the court's June 29 Order, "interim interest" is not an item of expense properly chargeable to the Airlines.

To understand the dispute over interim interest, it is necessary to understand the substance of the Agreement, which is a 32 year use and lease agreement for Airport space and facilities. Although each airline was to sign a separate agreement with the City, the agreements were to be identical except for the location and quantity of space rented by the Airline. The basic structure of charges under the Agreement is to require payment by the Airlines to the City of amounts which, together with all non-airline revenue generated by the Airport (snack bars, etc.), would equal, on an annual basis, the total expenses associated with the Airport. Thus the charges to be paid by the Airlines are dependent upon and directly reflect Airport expenses.

In 1972 the City undertook an extensive program to expand and modernize the International Airport. The City and the Airlines contemplated that, in addition to operating expenses, there would be included in the calculation of Airline charges the debt service charges of the Airport expansion program. The expansion program, amounting to over $100,000,000, was not to be paid directly by the Airlines, it was to be financed by the issuance and sale of long term revenue bonds by the City. The Airlines would then pay the annual debt service, including principal and interest, on the bonds. The Agreement reflects this understanding.

Interim interest arises in the following way: The bonds to finance the Airport expansion program were to be sold over four fiscal years beginning in June 1976. In the meantime actual payments for the work were made with money advanced from the City's consolidated funds to the

---

5. On December 17, 1976, the City filed a Motion to Modify that Stipulation because of the amount of time which had passed since it has been agreed to. Airlines responded to that Motion to Modify, but since the Motion to Exclude Interim Interest was then ripe for argument and decision, I advised counsel that it would serve no purpose to consider separately, and to rule upon, the Motion to Modify.

Department of Aviation. The interest charged to the Department of Aviation for these advances is denominated "interim interest."

The bulk* of the airport improvement work was completed in May 1975.[6] There is no dispute that the interest charges incurred while the work was being done and for a period of one year after completion of the work were to be included as part of the capital costs to be amortized over the 30 year term of the bonds to be issued and over the 32 year terms of the leases. The dispute is over the interim interest charges extending beyond one year after completion of the work, i. e., charges for Fiscal Year 1977 (beginning July 1, 1976) through Fiscal Year 1979, projected to total $9,190,000.

The parties contemplated that sufficient revenue bonds would be sold to pay out the total cost of the expansion program, including the interim interest charges. Apparently because the bonds were to be issued in nine month installments of $35,000,000 each over a period of 2½ years commencing June 1976, additional interim interest charges were anticipated to be incurred over the period of time from the issuance of the first installment of bonds until the last. Eventually the Airlines were to pay all the interim interest, but only indirectly as part of their obligation to pay the debt service on the bonds commencing Fiscal Year 1978. For reasons which do not appear in the record at this time, the City did not issue any airport revenue bonds in Fiscal Year 1976 and it does not presently appear that there are plans for issuance of such bonds in the near future. This failure to issue airport revenue bonds has prevented the City from obtaining reimbursement of its substantial advances and has caused a cash flow problem. That cash shortage has generated the present controversy over interim interest.

The issue presented by the Airlines' Motion to Exclude Interim Interest is a narrow one. Judge Fogel's Order dated June 29, 1976 provided, inter alia, that "[p]ending a

final determination by this Court of plaintiffs' Motion to Enforce Settlement Agreement . . . defendant shall charge plaintiffs for the use and occupancy of the [airport facilities] . . . in accordance with rates calculated pursuant to the pertinent provisions of that agreement." The only issue before me, therefore, is the interpretation of the Agreement. Does it provide that the Airlines were to be charged for interim interest in Fiscal Year 1977 as an item of expense?

A review of the terms of the Agreement reveals that the parties had negotiated an elaborate formula for the fixing of rates and charges for use of the Airport space and facilities. Section .403 of the Agreement, titled "Payment-in-Aid of Terminal Building Operations," is the key provision for setting rates and charges. Under section 403 each Airline is to make its share of "Payments-in-Aid" according to its percentage of the Airline Leased Space in the Terminal Building. The amounts of such payments are calculated as follows: The estimated "total annual Terminal Building expenses" are divided by the "gross Terminal Building space" to arrive at an estimated annual cost per square foot for Terminal Building space. The Airlines must pay the total of two sums: First, the amount derived by multiplying the estimated annual cost per square foot by the Airline Leased Space. Second, the amount derived by multiplying the estimated annual cost per square foot by the amount of space other than Airline leaseable space (i. e., the remainder of the space) and subtracting from that the total annual revenues to be generated from all sources other than the Scheduled Airlines. The key to the amount the Airlines must pay is the amount of the "total annual Terminal Building expenses." As to how they are to be calculated, section 403 provides only that:

"A. (1) City shall calculate the estimated total annual Terminal Building expenses in accordance with the Cost Accounting System illustrated in perti-

---

**6.** Although there may eventually be some dispute as to the completion date, for the pur- poses of their Motion to Exclude Interim Interest, the Airlines concede this to be the fact.

nent part on Exhibit ———, attached hereto."

Section 402 contains a list of the charges per square foot the Airline is to pay for leased space within the Airport terminal and loading ramp areas, including ticket counter and office space, baggage make-up space, concourse space, baggage claim space, and dolly concourse space. The last draft of the agreement that was prepared by the parties has blank spaces where the actual rental rates for each area were to be filled in, but as pointed out hereafter, the blank spaces do not necessarily indicate that the rates had not been agreed upon.

Section 404 provides generally that the Airlines shall pay for space available for leasing by the Airlines, but not actually leased by them, at the same rate as they pay for space actually leased. *See* description of section 403, *supra.* Each Airline is to pay in proportion to its percentage share of the total Airline Leased Space.

Section 405 provides for the payment by the Airlines of Landing Fees. Landing Fees are "calculated by multiplying the Maximum Landing Weight for each . . [arriving] aircraft by $——— per thousand (1,000) pounds." Again, the dollar rate is left blank in the draft Agreement, but other sections in fact establish the rate.

Article V of the Agreement is titled "Adjustment of Rentals and Fees," but a careful reading of its provisions reveals that it does more than provide for adjustment of fees. Article V sets forth in sections 502 through 504 the means by which the rates in sections 420 and 405 are calculated. Section 502 provides that on the basis of certain data furnished by the City and the Airlines, the Landing Fees charged in section 405 are to be computed " . . . consistent with the Cost Accounting System . . . ." Sections 503 and 504 set forth the same requirement for the calculation of Terminal Building rentals and loading ramp areas, respectively.

From the above summary of the provisions of the Agreement covering the charges to be assessed the Airlines, it becomes apparent that the Agreement is in-tended only to set forth the broad principles governing Airline charges. The term "interim interest" is not used in the Agreement. The details of the manner for calculating Airline charges are to be found in the Cost Accounting System: In Section 403 the "total annual Terminal Building expenses," which provide the basis for calculating "Payments-in-Aid," are based on the Cost Accounting System. Terminal and ramp area lease rates and Landing Fee rates are based on the Cost Accounting System.

Section 101.I. of the Agreement provides as follows regarding the Cost Accounting System:

"'*Cost Accounting System*' means the system for collection, allocation, and report of revenues, expenses, and debt service associated with the operation of the Airport System in such a manner that will ensure the availability of proper data to support the calculation of airline rates and charges required under this Agreement . . . ."

Section 403.A. (1) provides:

"City shall calculate the estimated total annual Terminal Building expenses in accordance with the Cost Accounting System illustrated in pertinent part on Exhibit ———, attached hereto."

No Cost Accounting System is attached to the Agreement, but section 101.I. of the Agreement further provides that:

"The [Cost Accounting] system of reporting revenues, expenses, and debt service utilized by the Division of Aviation will preserve the basic cost centers set forth in the Peat, Marwick, Mitchell & Co. Report . . . ."

And section 101.T. provides that:

"'*Peat, Marwick, Mitchell & Co. Report*' means the report entitled 'Rates and Charges Analysis' prepared by Peat, Marwick, Mitchell & Co., dated February 6, 1976 attached hereto and made a part hereof as Exhibit ———."

The Peat, Marwick, Mitchell & Co. Report (the Report) is a complete and detailed analysis of all the financial aspects of the

Airport expansion program. The Report "documents calculations of airline rates and charges required to support the program . . ." for the Fiscal Years 1975 through 1982. (Report at p. 1) In order to calculate the required Airline rates and charges, the Report considers both the capital costs of the expansion program and operating costs on a yearly basis through 1982. The "Cost Centers" of the Report referred to above parallel the lease charge break-down in Article IV of the Agreement. Thus costs and expenses are calculated in the Report by separate areas of the Airport —"Cost Centers"—enabling the parties to calculate the rental rates of sections 402, 404, and 405, and to calculate the expenses necessary to determine the Payments-in-Aid of section 403. The entire Report was obviously designed with the purpose of providing the parties with the data necessary to calculate all rates and charges due from the Airlines under the Agreement. "The calculations set forth in this report reflect the principles and procedures for calculating airline rates and charges as negotiated by the parties and incorporated in the . . . proposed new Airline-Airport Use and Lease Agreement." (Report at p. 1) The key assumption of the Report is that the City would sell revenue bonds [7] on the open market in the principal amount of $35 million per issue at nine month intervals commencing in June 1976 to finance the cost of the Airport expansion and modernization program. The Report contemplated the issuance of a total of $137 million of bonds, amortized over a 30 year period and carrying a 9% coupon rate of interest. *Id.*

The Report undertakes several financial analyses of the Airport operations and expansion program. For present purposes, it is sufficient to note the analysis of the C, E, and F series of exhibits. Exhibit C–1 sets out the estimated capital requirements and sources of capital for each stage of the Airport expansion and modernization program. C–2 sets forth for Fiscal Years 1972 through 1979 the projected cash flow of capital expenditures and capital fund sources. The E–series of exhibits provides both a historical statement and a forecast of revenues and expenses for each of the Airport "Cost Centers." The F–series of exhibits presents calculations deriving (1) the total Space Rental rates for sections 402 and 503 of the Agreement; (2) the total Payments-in-Aid required under section 403; (3) the total Landing Fee rates required under sections 405 and 502; and (4) the total Ramp Area rental payments required under sections 402 and 504. Projected charges are presented for each fiscal year from 1975 through 1982.

Examination of the format and figures described above leads inescapably to the conclusion that the Report, and therefore the Agreement, did not intend that interim interest would be directly chargeable to the Airlines. Beginning with the E–series of exhibits, items listed under expenses directly chargeable to the Airlines do not include interim interest. The amounts shown for project expenses do not reflect the interim interest charge for that year (as shown in Table 3 following page 10 of the Report). On the other hand, the figures presented as the amount of debt service chargeable to the Airlines for each cost center and for each fiscal year reflect a total revenue bond issue of $137 million. By cross referencing to the C–series and D–series of exhibits (discussed more fully below) it is evident that it was intended

---

**7.** Revenue bonds are different from general obligation bonds in two ways. The state constitution permits the City to issue general obligation bonds only so long as the City's total bond indebtedness does not exceed a certain percentage of the total assessed value of property within the City. Revenue bonds have no such limitation upon them. On the other hand, Revenue bonds may be issued only after the City has obtained a state court ruling that the project which the Revenue bonds are used to finance will produce sufficient revenue over and above operating costs to pay the debt service on the bonds.

The Agreement contemplated that the bonds issued beginning in June 1976 would be revenue bonds. *See* Agreement, §§ 508, 506.

Apparently the failure of the City and the Airlines to finalize and ratify the Agreement, which would insure the revenue to pay the debt service, is what has prevented the issuance of the revenue bonds.

that $137 million worth of revenue bonds would be required to be issued only if interim interest were capitalized and paid with receipts from the bond sales. Accordingly, the cost of interim interest was charged to the Airlines and paid for by them through the debt service payments.

The conclusion reached from examination of the E–series of exhibits is reinforced by the F–series of exhibits. The F–series takes the results calculated in the E–series and uses those figures to calculate the exact charges which Article IV of the Agreement obligated the Airlines to pay under Payments-in-Aid, rental rates, Landing Fees, etc. Since the E–series of calculations was based on the capitalization of interim interest rather than as a direct expense charge, those assumptions are necessarily included in the calculation of the actual rates in the F–series of exhibits. It thus becomes clear that the Report, and therefore the Agreement, did not intend interim interest as one of the charges set forth in Article IV of the Agreement as a direct expense.

Exhibit C–2 standing alone is convincing evidence that the Agreement did not intend that interim interest would be charged to the Airlines as a direct expense. C–2 is an analysis of Division of Aviation cash flow from Fiscal 1976 through Fiscal 1979. The interim interest accruing in each of those years is listed as an out-flow or "requirement." Below the Division out-flows are listed the sources of cash to meet the out-flow and to erase the Division's deficit over those four years. The sources listed include the $35 million per year sale of revenue bonds, but do not include any direct charges to the Airlines. If interim interest were to be repaid from Airline revenue, then either Airline revenue would be listed as a source on Exhibit C–2 or interim interest would not be listed as a requirement, i. e., a cash out-flow. This exhibit conclusively demonstrates that it was intended that interim interest would be capitalized and repaid

through debt service payments by the Airlines, not charged directly to the Airlines. The description of the C–series of exhibits in the Report states explicitly that interim interest charges ". . . are allocated to the Major components of the capital program." Report at 46.

■ From the foregoing review of the Agreement and the Report incorporated therein, it is quite apparent that the parties did not contemplate that interim interest for Fiscal Year 1977 would be charged as a current expense to the Airlines. Although, at the outset, the City strenuously denied that interim interest charges for that year were to be included as a capital item to be amortized over the life of the bonds, the City's counsel finally conceded at oral argument that it was indeed intended to be a capital item.[8] In seeking, despite that concession, to assess interim interest as an operating expense, the City now takes the position that it lacks the power under Article IX, section 12 of the Pennsylvania Constitution to capitalize interest beyond one year after completion of a project. It argues, therefore, that that portion of the Agreement is null and void, leaving the Airlines the alternatives of either accepting interim interest for Fiscal Year 1977 as an operating expense, or returning to the status pre-dating the entry of Judge Fogel's June 29 Order, i. e., to the unilateral imposition of rates and charges by the City by Regulation.

The City's concession that the Agreement did not contemplate that interim interest was to be directly chargeable as an expense to the Airlines really resolves the issue before me, and it is neither necessary nor appropriate to consider the issue which the City seeks to inject.

Judge Fogel's June 29, 1976 Order was clearly designed as an interim measure. The purpose was to establish the amounts the Airlines were to pay the City for use of

---

**8.** In response to a question from the court expressing doubt that the City expected the Airlines to pay interim interest as a current expense, the Deputy City Solicitor responded: "Absolutely correct [we didn't expect them to pay], because we expected to be paid by borrowing the money [to pay the interim interest charges] on which they would pay the debt service." N.T. pp. 51–52. *See also* N.T. pp. 41, 49, 59, 69–A, 75–76.

Airport space and facilities pending resolution of the dispute as to whether the parties had entered into an effective settlement agreement. As an expedient measure, and because the parties had so agreed, the Order adopted the rates and charges established in the Agreement. The validity of the Agreement itself is not in issue at this point. The fact that the Agreement may ultimately be determined, in whole or in part, to be void is irrelevant to the issue as to the rates and charges to be paid pursuant to Judge Fogel's Order, i. e., "in accordance with rates calculated pursuant to [the Agreement]."

The issue which the City seeks to raise—whether the capitalization of interim interest beyond one year after completion of a capital project violates Article IX, section 12 of the Pennsylvania Constitution—is a very serious one affecting the City's power to incur debt. That issue may not ever have to be resolved in this law suit.[9] Judge Fogel's Order requiring payment of rates calculated in accordance with the Agreement is to remain in effect only until it has been determined whether the parties had entered into a binding settlement agreement, i. e., whether they had entered into the Agreement. If, at the trial on the Motion to Enforce Settlement Agreement, it should be determined that the parties had not entered into the Agreement, the legality of the terms of the Agreement would be moot. It is only in the event that the Airlines prevail in their Motion to Enforce Settlement Agreement that it will become necessary to decide whether the City has acted beyond its power by including some of the terms of the Agreement. It will be time enough then to deal with the more vexing problem as to the alternatives which will be available in adjusting the relationship between the parties if the City has acted in violation of the Pennsylvania Constitution. It is not at all clear that the effect would be to void the Agreement, as the City argues. *See Addyston Pipe and Steel Co. v. City of Corry,* 197 Pa. 41, 46 A.

1035 (1900), and *Apollo Borough School District v. Kiskiminetas Township School District,* 399 Pa. 80, 159 A.2d 705 (1960).

The Airlines' Motion to Exclude Interim Interest will be granted.

---

9. It is a very interesting question of state constitutional and statutory law which might at some point be resolved in the state courts when (and if) the City seeks the required state court approval to issue the Airport revenue bonds.